Nora A. MYERS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Nora A. MYERS, Executrix of the Estate of Chester Myers, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 12642–4, 13008–4.

United States District Court
W. D. Missouri, W. D.
July 17, 1963.

72

Hensley, Rahm & Braton, by James A. Rahm and L. S. Braton, Warrensburg, Mo., for plaintiff.

F. Russell Millin, U. S. Atty., by John L. Kapnistos, Asst. U. S. Atty., Kansas City, Mo., for defendant.

BECKER, District Judge.

These two consolidated actions against the United States of America under the Federal Tort Claims Act arise out of an automobile collision occurring on United States Highway 40 near Berthoud Pass, Colorado, on April 11, 1959. The Court has jurisdiction to determine the controversy under Title 28 U.S.C.A. Section 1346(b).

On April 11, 1959, the plaintiffs, Nora A. Myers and Chester Myers, husband and wife, were traveling eastwardly near Berthoud Pass on United States Highway No. 40 in an automobile operated by Chester Myers. They were then and there involved in a head-on collision with a passenger automobile driven by Technical Sergeant Jessie G. Thomas, a member of the United States Air Force on active duty, traveling from Dover Air Force Base, Delaware, to Travis Air Force Base, California, pursuant to the orders hereinafter mentioned.

Nora Myers individually sues for damages for personal injuries sustained in the collision. Chester Myers, now deceased, sued for damages sustained in the collision, including medical expenses and loss of services of his wife, Nora Myers. Chester Myers is now deceased, and his wife, Nora Myers, has been substituted as plaintiff in the action filed by him in her representative capacity. The principal issues submitted to the Court are: (1) the amount of damages sustained by Nora Myers and by Chester Myers prior to his death; and (2) the liability of the United States to the plaintiffs, including the question of whether Sergeant Thomas committed a tort as an employee of the United States within the scope of his employment by the United States.

The complaint was submitted upon a record made in accordance with an agreement at pre-trial conference, which reads as follows:

"It is agreed between the parties as follows:

"1. These causes have heretofore been set for trial on this day, Monday, June 24, 1963. Both parties are ready for trial and submission of the cause to the Court upon this stipulation.

"2. It is agreed by the parties that the Court has jurisdiction to try this action as a non-jury case under the Federal Tort Claims Act.

"3. It is agreed by the parties that on April 11, 1959, about 2:50 p. m. at a point on United States Highway No. 40 (also Colorado Route No. 2; also Berthoud Pass), at a point one and four-tenths miles east of the Clear Creek—Grand County line in the State of Colorado, Jesse G. Thomas, carelessly and negligently drove a 1956 Studebaker coupe onto the left side of the center of said highway into the path of an oncoming 1958 Oldsmobile sedan then and there operated by Chester J. Myers, now deceased, husband of Nora Myers; that as a result of the carelessness of Jesse Thomas, as

aforesaid, a head-on collision occurred between the two vehicles causing personal injuries to the plaintiff Nora A. Myers.

"4. The parties further agree that neither Nora A. Myers nor Chester Myers were guilty of any acts of contributory negligence or any other conduct which would bar their right to recover against Jesse Thomas and against the defendant United States of America if it appears from the evidence and record and agreements that the United States was at the time of the collision and immediately prior thereto responsible in law for the actions of Jesse Thomas in operating said Studebaker coupe.

"5. It is agreed between the parties that the nature and extent of the injuries of the plaintiff, Nora Myers, and the value of the loss of her services resulting from her injuries shall be determined by the Court upon the basis of medical reports and hospital records and itemized special damages appearing from medical and hospital bills and bills for payment for housework as disclosed by verified answer to interrogatories submitted to the plaintiff Nora Myers.

"6. It is agreed by the parties that prior to the collision in question Nora Myers suffered from nondisabling hypertension over a period of approximately fifteen years; that her occupation was that of a housewife; that she and Chester Myers lived in their home at Route 5, Warrensburg, Missouri, at the time of the collision; and that the normal duties of a housewife, without a servant, were performed by Nora Myers prior and at the time of the collision; that the plaintiff, Nora Myers, prior to and at the time of the collision assisted her husband in the conduct of his business of contracting for road construction by driving vehicles, assisting him in the bookkeeping, and other matters as

disclosed by the verified answer to interrogatories propounded to Nora A. Myers; that these services were not rendered upon a commercial basis but by Mrs. Myers as a wife assisting her husband in the conduct of his business when needed.

"7. On the issue of liability of the United States, the parties agree that this issue be determined by the Court in its ruling upon the motion for summary judgment of the United States filed herein.

"8. It is agreed by the parties that the facts with respect to the issue of responsibility of the United States of America for the operation of the vehicle on April 11, 1959, be determined from the facts as stated in Suggestions in Support of Defendant's Motion for Summary Judgment, Part I, considered in connection with the deposition of Jesse G. Thomas, filed herein, and the verified answers to interrogatories of the plaintiffs considered in the light most favorable to the plaintiff; that no oral testimony be required as submitted.

"9. It is agreed by the parties that in determining the question of responsibility of the United States for the operation of the motor vehicle on April 11, 1959 by Jesse Thomas, that Colorado law is controlling.

"10. It is agreed between the parties that the following facts are not in dispute:

"a. For approximately 19 years prior to April 1959, Jesse G. Thomas had been a member of the U. S. Army Air Force and thereafter U. S. Air Force.

"b. That on April 2, 1959 and thereafter, to and including April 11, 1959, the regular duty station of Jesse G. Thomas was at the Dover Air Force Base in the State of Delaware.

"c. That at all times mentioned herein in April, 1959, Jesse G. Thomas held the rank of technical sergeant in the United States Air Force.

"d. That on April 2, 1959, at Headquarters, 1607th, Air Transport Wing (H) (MATS), United States Air Force, Dover Air Force Base, Delaware, pursuant to authority granted by law issued to Technical Sergeant Jesse G. Thomas, special order number A–179, ordering Technical Sergeant Jesse G. Thomas to proceed on or about 3 April 1959 to Headquarters, 1501st Air Transport Wing (MATS) at Travis Air Force Base in the State of California on temporary duty for approximately 36 days for the purpose of attending C–133 M. T. D. and Familiarization Course for approximately four academic weeks; and ordering Sergeant Thomas to report to Captain B. H. Moon at Building N. R. S. 150 at Travis Air Force Base, not later than 0730, 14 April 1959, and attaching Sergeant Thomas to the Headquarters 1501st Air Force Wing for administration during the period of duty. By said order Sergeant Thomas was cleared to access for classified material up to and including 'secret' for the period of the duty. By using the standard travel time by common carrier rail, the order to Sergeant Thomas allowed eight days travel time and provided that any excess over eight days would be chargeable to the 'delay enroute' which would be in turn charged against his leave time. Upon completion of the temporary duty Sergeant Thomas was directed by the order to return to Dover Air Force Base in Delaware. The travel was expressly directed as being necessary to military service. The order further expressly authorized travel by private vehicle.

"The same order (special order number A179) included within the directions of the order two other members of the 1607th Air Transport Wing, namely Master Sergeant Wayne Moore and Staff Sergeant

Charence C. Hartz; that Sergeant Thomas under the terms of the order was authorized to travel in his own private vehicle although he could have chosen any other means of conveyance; that Sergeant Thomas did not depart from Dover Air Force Base toward Travis Air Force Base until April 8, 1959. He was traveling directly from Dover Air Force Base to Travis Air Force Base by direct route when the collision occurred; that Sergeant Thomas was authorized to collect from the United States five cents a mile for the travel from Dover Air Force Base to Travis Air Force Base, either before departing or later; that Sergeant Thomas could not recollect whether he collected the mileage allowance before departing or later; that in the automobile involved in the collision and operated by him, Sergeant Thomas was carrying his civilian clothes, his necessary uniforms and flying equipment, and his golf clubs. His flying equipment consisted of military clothing, survival equipment, arctic survival equipment, and tools necessary to perform his duties; that the Government property carried by him in his automobile at the time of collision was worth about $2,000, about which he was quite concerned since he was responsible for it. Sergeant Thomas neither made nor planned to make any detours, side trips or pleasure trips on his trip from Dover Air Force Base to Travis Air Force Base pursuant to orders. (In this connection there appears in the verified answer of Chester Myers to Interrogatory No. 26 propounded by the defendant, that Sergeant Thomas stated at the scene of the collision that he did not want to leave the Air Force equipment which he was carrying in his car because he was responsible for it and was being sent to the west coast on a training temporary duty assignment and that he was taking the equipment with him for this purpose); that during his trip from Dover Air Force Base to Travis Air Force Base, Sergeant Thomas was on active duty and was drawing his usual and ordinary rate of pay in addition to travel allowance, and subject to the control of the Air Force (that in fact no control was exercised over Sergeant Thomas from the time he left Dover Air Force Base until the time of the collision except that contained in special order number A179 referred to herein and statutes and regulations applicable to him); Sergeant Thomas was given no specific or express directions as to the route he should travel or the manner in which he should operate his private vehicle except insofar as any such directions may be found in any statute or regulation to which he was subject; that the M. T. D. Familiarization Course which Sergeant Thomas was ordered to attend is training concerning the line of work to which he as assigned by the Air Force.

"11. In determining factual matters not agreed upon, the Court may consider as true in the light most favorable to the plaintiff all matters contained in any deposition filed herein, or verified answer to interrogatory heretofore filed herein.

"12. Counsel for parties are each granted leave to file additional suggestions within ten days."

### DAMAGES OF NORA MYERS INDIVIDUALLY

The Court finds as a fact that Nora Myers individually has sustained damages as a result of the collision between the automobile in which she was riding and the automobile driven by Technical Sergeant Jessie G. Thomas in the sum of $22,500.00.

Upon the record made, the Court finds the following facts concerning the personal injuries of Nora Myers:

Prior to the collision of April 11, 1959, plaintiff Nora Myers was suffering from non-disabling hypertension for which she

had been taking medication, and non-disabling osteoarthritis of the cervical spine. As an immediate and direct result of the collision in question, the plaintiff Nora Myers suffered a severe sprain of the cervical region with attendant pain and tenderness in the back of the neck extending into the right shoulder region and attacks of pain and numbness down the upper right extremity to the hand. In this connection she also suffered severe headaches, disorientation and vertigo. Her pain in the cervical region, right shoulder and upper extremity have continued for more than four years and have not responded to therapy. There is an indication of damage to the soft tissues and nerves which existed in the last examination on June 21, 1963 and seems reasonably certain to be permanent. These injuries resulted from traumatic aggravation of pre-existing osteoarthritis as a result of the collision and will require continued medical treatment. Her life expectancy at her present age of 65 is approximately 16 years, using the United States Total Population 1939-1941 Table (42 VAMS 802).

Within 19 days of the collision in question the plaintiff was hospitalized for essential hypertension and coronary insufficiency. During her hospitalization she suffered a coronary occlusion and a myocardial infarction which resulted in a permanent damage to her heart which was apparent on her last examination June 21, 1963 by Dr. William Lowe Mundy, the cardiologist. This condition is reasonably certain to be permanent and will probably become progressively worse. The collision was a contributing cause to this coronary occlusion. Plaintiff Nora Myers was predisposed to such an injury by virtue of her pre-existing condition of hypertension, atherosclerosis, and a rather gross cardiac valvular change. The mechanics of the production of the coronary occlusion and consequent permanent damage are as follows: An injury producing severe pain which caused plaintiff to have an elevation of her already high blood pressure and an increase in pulse rate; the increase in blood pressure and the increase in pulse rate altered the coronary circulation producing a thrombosis or a gross coronary insufficiency resulting in myocardial infarction. Consequently, her present heart condition which is permanent and progressive is a proximate result of the trauma in the sense that the trauma from the collision elevated hypertension, blood pressure, and caused the myocardial infarction through the process of coronary thrombosis. In this connection her permanent near total disability resulting from her heart condition and her neck, shoulder and arm condition is causally connected to the trauma of the collision.

In connection with the the heart condition it is noted that Dr. Morley, internist of the Veterans' Administration who conducted an examination of the plaintiff Nora Myers for medical-legal purposes, stated that he was unable to say whether the cardiac condition was caused by this injury, not having seen the patient before. Dr. Mundy, a well qualified cardiologist who attended the plaintiff, Nora Myers, states that "there is no question in my mind as to the cause and effect relationship of accident, residual pain, and disability and the occurrence of myocardial infarction." The reasoning of Dr. Mundy is in accord with the teachings of the most prominent authorities in this field.

## DAMAGES OF CHESTER MYERS PRIOR TO HIS DEATH

The Court finds that as a result of the collision between the automobile which he was driving and the automobile driven by Technical Sergeant Jessie G. Thomas, Chester Myers, prior to his death, sustained special damages in the sum of $1,759.94, consisting of medical expenses incurred as a result of the injuries of Nora Myers and for the employment of household help as a result of the disability of Nora Myers following the collision of April 11, 1959. In addition, Chester Myers sustained damages for loss of services of Nora Myers in the additional sum of $4,000.00, or a total sum of $5,759.94.

## ADDITIONAL FACTS FOUND

The following additional facts are found from the papers upon which this case is submitted:

Sergeant Thomas was proceeding as directed in orders from Dover Air Force Base to Travis Air Force Base on active duty while being paid compensation. On April 11, 1959, he was proceeding by a reasonably direct route to his temporary duty station at Travis Air Force Base. He was not on April 11, 1959, using delay time for his personal purposes. He was carrying with him in his private automobile a substantial amount of government property to be used in connection with his temporary duty at Travis Air Force Base. He was driving a privately owned automobile for which he was compensated by the payment of mileage by the United States. At the time of the collision he was in an authorized active duty status. The United States was interested in his travel from Dover Air Force Base to Travis Air Force Base. There was no personal purpose of Sergeant Thomas being served by the transportation during which the collision occurred.

Sergeant Thomas by his orders and by Air Force regulations was given the option of traveling by common carrier or by private transportation. He exercised the option to travel by private transportation.

## BASIC CONSIDERATIONS ON THE LIABILITY OF THE UNITED STATES

The following basic considerations upon the liability of the United States for the operation of the motor vehicle of Sergeant Thomas on April 11, 1959, are not controverted or questioned by either party:

■ (1) The question of liability of the United States to the plaintiffs, including the question of whether Sergeant Thomas committed a tort as an employee of the United States within the scope of his employment by the United States, must be determined under the law of Colorado, where the alleged tort and injuries occurred. Annotation: 7 L.Ed.2d 492, l. c. 1001–1002, and cases therein collected; Annotation: 1 A.L.R. 2d 222, l. c. 234; 28 U.S.C.A., sections 2671 and 2674. The fourth paragraph of Section 2671, Title 28, U.S.C.A., provides as follows:

> " 'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, means acting in line of duty. June 25, 1948, c. 646, 62 Stat. 982, amended May 24, 1949, c. 139, § 124, 63 Stat. 106."

In the case of a member of the military or naval force of the United States, the use of the phrase "in line of duty" in Section 2671 does not expand the legal doctrine of *respondeat superior* beyond "the scope of his office or employment" as applied in the applicable state law for determining the liability of a private employer. United States v. Mraz (C.A. 10) 255 F.2d 115; United States v. Campbell (C.A.5) 172 F.2d 500, cert. denied, 337 U.S. 957, 69 S.Ct. 1532, 93 L.Ed. 1757; King v. United States (C.A. 5) 178 F.2d 320, cert. denied, 339 U.S. 964, 70 S.Ct. 998, 94 L.Ed. 1373. In determining whether a serviceman himself may recover from the United States for injuries incurred in military service, the phrase "in line of duty" will be construed according to federal law since it involves an exclusively federal question. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152. The principle is not applicable here.

(2) If under the Colorado principles of *respondeat superior* applicable to private persons, the United States would be liable to the plaintiffs for the acts and omissions of Sergeant Thomas at the time and place in question, plaintiffs are entitled to recover. Williams v. United States, per curiam, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761.

(3) If on the other hand, the United States would not be liable to the plaintiffs for the acts and omissions of Ser-

geant Thomas under the Colorado principles of *respondeat superior* applicable to private persons, the plaintiffs are not entitled to recover. Williams v. United States, supra.

## CONCLUSIONS OF LAW

■ The doctrine of *respondeat superior* is applicable in controversies between private persons and the State of Colorado. Lombardy v. Stees (Colo.Sup. en banc, 1955) 132 Colo. 570, 290 P.2d 1110; Cooley v. Eskridge (Colo.Sup. en banc, 1952) 125 Colo. 102, 241 P.2d 851. The leading Colorado case of Cooley v. Eskridge, supra, states the doctrine applicable between private persons in Colorado in the following language:

"We recognize as a general rule of law that a master is liable in an action by a third party for any damages resulting from any act of his servant during the employment if the act is within the scope of the servant's employment. The phase 'scope of employment' used in connection with the master's liability for the acts of a servant is to be determined by what the servant is doing for the master and what he actually does with the knowledge and approval of the master. If an act is performed by a servant within the scope of his employment, as that phrase is properly construed, and damages to another result therefrom, the master is unquestionably liable therefor. However, to impose this same liability upon a master for an act of a servant 'while in his employ' would result in a master becoming accountable in damages for very [sic] tort committed by the servant so long as his term of employment continues. It should be recognized that there is a marked distinction between an act done by a servant 'during his employment' and an act done within the 'scope of his employment.' " 241 P.2d at 855.

" ' * * * The test of the liability of a master for the tortious acts of his servant, now universally accepted, is whether there was express or implied authority for doing the act relied upon by the plaintiff. In the customary legal phraseology, to make the master responsible for the acts of his servant the act must be done in the scope or course of the servant's employment, that is, under the express or implied authority of the master.' 35 Am.Jur., p. 983, § 552." 241 P.2d at 856.

■ Under the law of Colorado, a master is liable for the acts of a servant, not only when they are directed by the master but also when the scope of his employment or trust is such that the servant has been left the liberty to do, while pursuing or attempting to discharge the employment or trust, the injurious act complained of. It is not merely for the wrongful acts that the servant was directed to do, but also for the wrongful acts he was suffered to do, that the master must be responsible. Lovejoy v. Denver & R. G. R. Co. (Colo. Sup.1915), 59 Colo. 222, 146 P. 263, L.R.A.1915E, 888, Ann.Cas.1916E, 1075. At the time of the collision in question, Sergeant Thomas was acting in the scope of his employment as a Technical Sergeant of the United States Air Force, under the law of Colorado because: (a) he was authorized and directed to travel from Dover Air Force Base to Travis Air Force Base; (b) he was traveling as authorized and directed by reasonably direct route; (c) while he was not directed to travel by private automobile, the scope of his employment was such that he was expressly left at liberty to do so;[1] (d) he was transporting prop-

---

1. Under Colorado law ownership by the servant of the automobile involved is not inconsistent with application of the doctrine of *respondeat superior*. United Brotherhood of Carpenters v. Salter (Colo. Sup.1946) 114 Colo. 513, 167 P.2d 954, l. c. 957, where it is stated:

"The fact * * * that the automobile was personally owned by [the servant] * * * and not by the [master]

erty of the United States for use in his temporary duty assignment to commence at the end of his trip; (e) he was on active duty and subject to general military control by the United States Air Force and his orders and directions could have been changed en route; (f) he was subject to military discipline and control under the uniform code of military justice for misconduct in the operation of his motor vehicle; and (g) no private purpose of Sergeant Thomas was being served in the movement from Dover Air Force Base to Travis Air Force Base except his interest in the proper and efficient performance of his military duties.

■ Authorities discussing responsibility for military personnel in travel pursuant to orders, involving the laws of states other than Colorado are not controlling. No case involving the Colorado law in such a situation has been found by the Court or counsel. Cases involving the law in other states where torts have been committed in the course of travel from one duty station to another in a private automobile pursuant to orders reached diverse results. Among those holding the United States responsible in cases not wholly dissimilar in facts are the following: Cooner v. United States (C.A.4) 276 F.2d 220, applying the law of New York in a permanent change of duty station transportation; United States v. Mraz (C.A.10) 255 F. 2d 115, applying the law of New Mexico; Hinson v. United States (C.A.5) 257 F. 2d 178, applying the law of Georgia; United States v. Kennedy (C.A.9) 230 F.2d 674, applying the law of Washington [and distinguishable on the ground that the soldier involved was in leave status]; Satterwhite v. Bocelato (E.D. N.C.) 130 F.Supp. 825, applying the law of North Carolina. See also Government

Liability for Torts of Military Personnel Under the Federal Tort Claims Act, 45 Minn.L.Rev. 275, approving the view of the Cooner case, supra.

On the other hand, liability has been denied in the following cases: United States v. Eleazer (C.A.4) 177 F.2d 914, applying the law of North Carolina, and distinguishable because the Marine lieutenant in question was in a leave status; United States v. Sharpe (C.A.4) 189 F. 2d 239, applying the law of South Carolina, and distinguishable because the paratrooper involved was traveling at his own expense and responsibility without allowance of mileage; Chapin v. United States (C.A.9) 258 F.2d 465, applying the law of California; Rutherford v. United States (C.A.6) 73 F.Supp. 867, affirmed D.C., 168 F.2d 70, applying the law of Tennessee and distinguishable on the ground that the naval petty officer in question was not engaged in the performance of any assigned duty and was driving home in a private automobile exclusively for private and personal purposes; Jozwiak v. United States (S.D. Ohio) 123 F.Supp. 65, applying the law of Ohio and distinguishable on the ground that the tort feasor was not in the armed services; Kunkler v. United States (N.D.Fla.) 187 F.Supp. 816, applying the law of Florida and distinguishable on the ground that the airman in question was in a leave status and was farther from his destination when the tort occurred than he was at the outset of his journey; Sievers v. United States (D.Ore.) 194 F.Supp. 608 applying the law of Oregon and perhaps distinguishable on the ground that Sergeant Thomas in the case at bar was transporting government property, and citing the case of Knapp v. Standard Oil Co., 156 Or. 564, 68 P.2d 1052.

* * * has evidentiary value, but is not conclusive as to whether the car was used in the scope of [the servant's] * * * employment. It merely eliminates any presumption of such use and,

considering the nature of [the servant's] * * * duties, both as alleged and admitted, the fact of such ownership * * * would have slight weight in determining the question.".

This case involves a temporary duty change transportation and the transportation of government property for use in the temporary duty. On this subject the following has been said in an article cited by the government:

"The PCS situation must be distinguished from one in which a serviceman is ordered to perform short-term travel incident to the routine preformance of his job. Temporary duty travel (TDY), as distinguished from PCS travel, in private automobiles generally has been considered within the scope of employment. The most recent court so holding summarized: 'A permanent transfer of great distance and time, allowing some amount of discretion to the employee, is generally the employee's personal trip, while a transfer, temporary and recurring in nature, of less distance, time, and discretion is ordinarily the employer's trip * *.' [Citing Sample v. United States (D. Minn.1959) 178 F.Supp. 258 [259].] Both the control and purpose tests are more easily satisfied in the TDY situation." Pemberton, Sovereign Tort Responsibility in a 1960 Perspective: Current Problems in Practice Under the Federal Tort Claims Act, 4 U.Cinc.L.Rev. 406, l. c. 458.

Sergeant Thomas was guilty of negligence, causing damages to Nora Myers and Chester Myers.

Nora Myers is entitled to have and recover from the defendant the sum of $22,500.00, and the estate of Chester Myers is entitled to recover of and from the defendant the sum of $4,000.00 plus $1,759.94, or a total of $5,759.94.

The prevailing party is directed to submit on notice a form of judgment in accordance with the findings and conclusions herein under Rule 6(c) of the Rules of this Court.